UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CRIMINAL ACTION NO. 5:18-cr-81-REW-MAS

UNITED STATES OF AMERICA                              PLAINTIFF

V.          RESPONSE TO DEFENDANT'S PRE-HEARING
               BRIEF ON LOSS

LIVIU-SORIN NEDELCU                             DEFENDANT
    a.k.a. IDL100
    a.k.a. Sorin Moshu

\* \* \* \* \*

The United States, through counsel, hereby responds to the Defendant's pre-hearing brief on loss amount. The United States's loss calculation, as adopted by the U.S. Probation Office ("Probation") in the Defendant's Presentence Investigation Report ("PSR"), accurately attributes a loss amount between $1,500,000 and $3,500,000 to the Defendant, which results in a 16-level enhancement. The United States sets forth its legal position and proffers factual support for this loss amount in this brief, and will present evidence to support the facts at the hearing scheduled for November 11, 2020.

## OVERVIEW OF THE CALCULATION METHOD

The individual loss amount attributable to the Defendant, Liviu-Sorin Nedelcu, was calculated in the following way:

- From May 2, 2015 until December 2017, the Defendant sent a total of $31,900 worth of fraudulently derived funds to the Confidential Source, for the purpose of having that money laundered through his bitcoin wallets.

- As a result of the United States-based money laundering operation, the Defendant received $20,722.24 in profits in the form of bitcoin to bitcoin wallets he provided to the Confidential Source, or approximately 65% of the fraud funds.

- A review of records from the Defendant's email accounts demonstrated that he was actually engaged in criminal activities since November 2014. From a period of November 2014 until December 2017, Defendant's bitcoin wallets received $328,137 (based on the bitcoin value on the day of the transaction, and not including any inter-wallet exchanges or transactions originating from known addresses of other co-defendants). Given the evidence that the Defendant only received 65% of the funds defrauded out of victims into his bitcoin wallets, this results in an extrapolated, individual loss amount of $505,137.01.

The reasonably foreseeable loss amount attributable to the Defendant was calculated in the following way: Because Defendant was aware that he was involved in a multi-member online auction fraud network that spanned multiple countries, the conspiracy's loss was reasonably foreseeable to him. The AOAF Network's total loss amount is incalculable – the number of victims involved is an unknowable number. However, investigators can prove that at least 10 other fraudsters (aside from the Defendant) in this conspiracy caused a loss amount of $2,707,460.

In total, this aggregates to a loss amount of $3,212,597.01.

## ARGUMENT IN SUPPORT

The Defendant first contests the United States's individual loss calculation against him. The loss calculation is driven by the wire fraud guideline found in U.S.S.G. § 2B1.1, because "the defendant committed the underlying offense … and the offense level for that offense can be determined." U.S.S.G. § 2S1.1(a)(1). Section 2B1.1 provides the enhancement to the Defendant's Guidelines calculation for loss amount based on the loss table at U.S.S.G. § 2B1.1(b)(1). The commentary defines the pertinent terms defining loss:

a. "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.

b. "Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money.

    c. "Reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense.

U.S.S.G. § 2B1.1 cmt. n. 3(A)(i), (iii), and (iv).

In this case, a precise loss amount is impossible to determine, based on the way the fraud was conducted and the manner in which it could be investigated. The defendants employed dozens, if not hundreds, of email addresses assigned to fake names to communicate with victims, communicated over encrypted chat platforms, accessed the internet through VPNs and other anonymizing tools to hide their IP addresses, and received funds in the pseudonymous cryptocurrency of bitcoin after several layers of laundering had already occurred.

However, "[t]he court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n. 3(C). This estimate need not be "rendered with scientific precision." *United States v. Gordon,* 495 F.3d 427, 431 (7th Cir. 2007). Included in a range of factors to consider in reaching this estimate is consideration of "the scope and duration of the offense and revenues generated by similar operations." The United States, however, must prove loss based upon a preponderance of the evidence. *United States v. Poulsen,* 655 F. 3d 492, 513 (6th Cir. 2011).

### A. LOSS ATTRIUTABLE TO NEDELCU INDIVIDUALLY

#### 1. *Extrapolation under 2S1.1(a)(1) is proper*

The Defendant performed two principle roles in this case: a fraudster and a money launderer. The Defendant defrauded American victims well before he contacted the Confidential Source, and defrauded more victims out of more money than was sent through the Confidential Source. However, because the United States cannot prove the totality of

the Defendant's fraudulent conduct outside those transactions delivered to the Confidential Source, the United States must rely on the principle outlined in § 2B1.1 cmt. n. 3(C), requiring a reasonable estimate of the loss. *See United States v. Agbebiyi*, 575 F. App'x 624, 630-31 (6th Cir. 2014) ("Where losses are not easy to quantify, the court is only required to make a reasonable estimate of the loss, given available information, and such estimates need not be determined with precision."); *United States v. Triana,* 468 F.3d 308, 320 (6th Cir.2006) (explaining that this precept rings true for "situations where the losses occasioned by financial frauds are not easy to quantify").

In such situations, Courts turn to extrapolation to determine the loss amount, that is, taking a known quantity and applying that across some period of time where the exact amount of loss is unknown. *See United States v. Tipton*, 269 F. App'x 551, 561 (6th Cir. 2008) (holding that extrapolation methods are appropriate when "the fraud occurred over a long period of time, and a precise calculation of the loss is simply not feasible"); *United States v. Stoian*, 73 F. Supp. 3d 830, 833 (E.D. Ky. Dec. 19, 2014) (citing string of cases approving extrapolation methods). In *Stoian*, the United States possessed a ledger that documented the fraudulent activity for only a limited period of time, but produced evidence that Defendant Stoian and others participated in the fraud and money laundering scheme well beyond that period of time. *Id.* at *835. Ultimately, the Court adopted an extrapolation method in determining a loss amount. *Id.* at 835-38, *aff'd United States v. Carmichael*, 676 F. App'x 402, 406 (6th Cir. 2017).

Unlike the *Stoian* case, which suffered from a lack of "lack of data points outside of the time period described in the ledger," *id.*, the United States was able to obtain data points outside the known quantity from the Defendant's bitcoin wallets. Here, the

Confidential Source was only one of the money laundering tools the Defendant used. A review of the Defendant's email account – foiaol2015@gmail.com – and his Localbitcoins accounts – Rapitoru007 and idl100 – demonstrate that he engaged in transactions outside the Confidential Source. A review of his accounts at Paxful yield a similar result.

Perhaps more importantly to this analysis, in the course of his communications with the Confidential Source, the Defendant provided the Confidential Source with bitcoin addresses to which to send his fraudulently obtained bitcoin. Investigators then pulled the bitcoin transactions from those addresses for the period of time that the Defendant was known to operate, and converted the amounts transacted to United States Dollars, based on the conversation rate on the date of the transaction, to total up the amount of bitcoin he received. However, it was clear from the transactions with the Confidential Source that the bitcoin the Defendant received as a result of his fraudulent activity was only 65% (the "profit percentage") of the money he actually defrauded from victims. Far from a mere "assumption" as alleged by the Defendant, the government calculated the Defendant's profit percentage based on his actual dealings with the Confidential Source. As provided above, the Guidelines instruct that loss is the pecuniary harm caused as a result of the offense. U.S.S.G. § 2B1.1 cmt. n. 3(A)(i). Thus, the United States turned to an extrapolation method, based on known values (the profit percentage and the amount of bitcoin the Defendant received), to arrive at an individual loss amount of $505,137.01.

In response to the Defendant's contentions that he earned this income legitimately, the United States requested from the Romanian authorities the income and employment information for this Defendant, as well as his co-Defendants. Defendant Nedelcu only reported income in 2007 (income of 0 Romanian Leu); 2016 (income of 1,541.00 Leu from

gambling winnings); and 2017 (income of 27,000 Leu from gambling winnings). He reported no employment to the Romanian government.

Accordingly, the evidence provided at the loss hearing will demonstrate that, by a preponderance of the evidence, the bitcoin entering the Defendant's bitcoin addresses was criminally obtained, and he was an online auction fraudster by trade. The extrapolation method, which is rooted in known quantities, is an appropriate estimate of the individual loss of this Defendant. Ultimately, the individual loss amount attributed to the Defendant is correct.

### 2. *Defendant's Commingling Argument is Unpersuasive*

Even if some of the bitcoin entering those wallets was legitimately earned, treatment of commingled funds in the money laundering context is instructive. Case law and the Guidelines treat comingled funds as part and parcel of the offense at issue, because infusing legitimately obtained funds with illegitimately obtained funds contributes to the concealment of the nature, source, origin, and location of the illegitimate funds. The Sixth Circuit explained, "When money from illegal sources is co-mingled with money from unspecified other sources, 'all such funds are attributable to the money laundering scheme.'" *United States v. Jamieson,* 427 F.3d 394, 404 (6th Cir. 2005) (quoting *United States v. Owens,* 159 F.3d 221, 229 (6th Cir.1998)).

Take as another example the money laundering Guidelines. If the Court considered the analysis under § 2S1.1(a)(1) and determined that the offense level for that offense cannot be determined, it would turn to § 2S1.1(a)(2) to calculate the Defendant's Guidelines range. Under § 2S1.1(a)(2), "if the amount of the criminally derived funds is difficult or impracticable to determine, the value of the laundered funds, for purposes of

subsection (a)(2), is the total amount of the commingled funds." § 2S1.1 cmt. n. 3(B). Considering this principle, the Government's loss calculation method as it relates to the Defendant's bitcoin addresses is reasonable, substantiated, and supported by the law.

### B. THE ENTERPRISE'S LOSS WAS REASONABLY FORESEEABLE

The Defendant also contests the Government's calculation of the loss attributable to the Defendant by virtue of his participation in the RICO conspiracy. According to the Guidelines,

> in the case of jointly undertaken criminal activity . . . all acts and omissions that were
>
> (i)   within the score of the jointly undertaken criminal activity,
> (ii)  in furtherance of that criminal activity, and
> (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense

shall be included as relevant conduct, and the pecuniary harm resulting therefrom shall be made part of the Defendant's loss amount. U.S.S.G. §§ § 1B1.3(a)(1)(B), 2B1.1.[1]

This is certainly a case of jointly undertaken criminal activity, which the Defendant concedes. [R. 678: Nedelcu Plea Agreement.] And he was a major contributor to the operation of the AOAF Network, as both a fraudster and a money launderer, whose conduct

---

[1] It appears the parties agree that the guiding analysis is set forth in *United States v. Donadeo*, 910 F.3d 886, 901 (6th Cir. 2018). The United States has previously set forth its analysis under the *Donadeo* factors in its response to the Defendant's motion for an evidentiary hearing, and the United States reincorporates that analysis here. *See* Docket Entry 883 at 6-11. Notably, Defendant's reliance on *United States v. Bailey*, 973 F.3d 548 (6th Cir. 2020) is misplaced. There, the Sixth Circuit reversed on procedural grounds because the District Court did not apply the yet-to-be announced *Donadeo* factors. *Id*. at 575. Here, as stated previously, the *Donadeo* factors support inclusion of the loss attributable to the defendant's conspirators.

spanned the majority of the time the conspiracy existed (May 2, 2015 through until December 2017, although he never offered any signs of withdrawal at that point). To determine the scope of the criminal activity the defendant agreed to jointly undertake, the Court considers "the scope of the specific conduct and objectives embraced by the defendant's agreement", which may be proved from the conduct of the defendant or others. U.S.S.G. § 1B1.3 cmt. n. 3(B). The Defendant pleaded guilty to Count One in the Indictment, which set forth the scope of the conspiracy as "a wide-scale online auction fraud scheme, that is, posting false advertisements for goods online, often using stolen identities and trademarks from legitimate online auction companies, with the intent to defraud United States-based victims out of money and laundering the money through channels in the United States and ultimately Europe." [R. 249: Superseding Indictment.] Indeed, the Defendant's admissions align with this scope. [*See* R. 678, at ¶ 3(c)-(e).]

The participants in this conspiracy include the other Romanian fraudsters and carders named in the indictment and superseding indictment (collectively herein referred to as the indictment), two low-level Romanian money mules, two foreign-based money processors, four domestic money processors, and "others . . . unknown to the Grand Jury." [R. 249 at ¶ 1]. The named Romanian defendants occupied many roles throughout their times in the conspiracy, shifting from posters, to responders, to leaders, to money launderers, and back again as needed. While they operated as a loosely connected but highly organized enterprise, the RICO co-conspirators shared tools, tricks of the trade, and often profits amongst each other. The acts of the Romanians named in the indictment, which generated the loss attributed to the Defendant, were certainly "in furtherance of the criminal activity."

The real crux of the issue is whether the acts of these co-conspirators were reasonably foreseeable to the Defendant. "Foreseeability is not equivalent to actual knowledge. A defendant need not know of a co-schemer's actions for those actions reasonably to be foreseeable to the defendant." *United States v. Aslan*, 644 F. 3d 526, 537 (7th Cir. 2011). The Defendant concedes that the acts of Adrian Mitan alone were reasonably foreseeable to him (adding $17,382 to his loss amount), but the Defendant's reasonable foreseeability expanded well beyond such a narrow view. This is supported by analyzing the evidence from two perspectives:

First, as to the Romanian fraudster co-conspirators: The conduct of the other RICO fraudster co-conspirators, including Ionut Ciobanu, Stefan-Alexandru Paiusi, Andrei-Catalin Stoica (and his crew), Marius-Dorin Cernat, Alexandru Ion, Eugen-Alin Badea, Beniamin-Filip Ologeanu, Victor-Aurel Grama, and Cristisor Olteanu are attributable to the Defendant, as their conduct was reasonably foreseeable to the Defendant. Their connections are varied and complex. For example, conversations between the Defendant and the Confidential Source revealed that the Defendant knew he was involved with a group of Romanians and numerous others. Their funds were pooled with the Confidential Source, who exported that money to domestic processors. The Defendant even attempted to sell the Confidential Source Craigslist account, or have the Confidential Source set up a deal with other fraudsters.

Moreover, records and statements demonstrate that Andrei Stoica had bitcoin transactions with the Defendant. Stoica and his crew worked with Ciobanu, Paiusi, Ion, and Olteanu. Records also show that Ologeanu had bitcoin transactions with the Defendant, and that he cashed out his bitcoin with Iossifov. Iossifov cashed out bitcoin for

other co-conspirators, including Ologeanu, Popescu, Ion, as well as a number of other co-conspirators unnamed in this indictment. Popescu worked with Cernat and Grama, and had transactions with Badea. Additionally, each of these individuals, as well as others named and unnamed in the indictment, reached out to the Confidential Source to receive and process fraud funds. The Defendant, Ologeanu, Stoica and his crew, Cernat, Popescu, Grama, Olteanu, Ciobanu, and Ion all operated online auction fraud schemes that used the same modus operandi (including the same ad-posting sites, similar invoices, near-identical language when communicating with victims, and payment methods) and the same money laundering tools. This is similar to the example in U.S.S.G. § 1B1.3 cmt. n. 4(C)(ii), where, when Defendants F and G worked together to design and execute a fraudulent scheme, and then they both profited separately, the Guidelines instruct that their loss amounts are attributable to the other. The harm caused by the other fraudster members of the RICO conspiracy was reasonably foreseeable to the Defendant, and the loss resulting therefrom should be attributed to him.

Second, as the domestic processor co-conspirators: The conduct of the other RICO money laundering co-conspirators are attributable to the Defendant, as their conduct was reasonably foreseeable to the Defendant. In conversations with the Defendant, the Confidential Source made clear that he had "guys" working for him to convert fraud funds; the Defendant even argued with the Confidential Source over not using certain teams because they are too slow. Thus, it was reasonably foreseeable to the Defendant that he used a large network of domestic processors in furtherance of his fraudulent activities. The Confidential Source kept ledgers accounting for money laundering transactions with his "guys", which reveal a total amount in excess of $2,600,000 in successful money

laundering transactions.[2] The harm caused by the domestic members of the RICO conspiracy was reasonably foreseeable to the Defendant, and the loss resulting therefrom should be attributed to the Defendant.

### C. OTHER RELEVANT CONSIDERATIONS

The loss amount the Government calculated as to the Defendant is conservative, as it does not account for intended loss – that is, the thousands of ads that victims responded to but for which they never sent money, and the hundreds of times victims sent money but were able to rescind those transactions before the money was stolen. This loss amount does not include the actual loss caused by the Romanian co-defendants, which funds were not processed through the Eastern District of Kentucky. This loss amount does not include the loss occasioned by the dozens of other Romanian fraudster co-conspirators, who were members of the AOAF Network but were not included in this indictment.

Moreover, the victim loss amounts uncovered by the Government in this case supports a loss amount between $1,500,000 and $3,500,000. As explained in recent filings, the total losses suffered by victims of the AOAF Network – that the Government was able to find – amounted to $2,703,767.58. [R. 835, 843.] Using the victim loss amounts alone would be a sufficient means to calculate loss. *See* U.S.S.G. § 2B1.1 cmt. n. 3(C)(iv); *United States v. Abdelsalam*, 311 F. App'x 832, 846 (6th Cir. 2009) (holding that the estimate of loss "for example, may be based upon the approximate number of victims and the average loss to each victim, or on more general factors such as the scope and duration of the offense."). That the victim loss amount and the Government's loss amount calculation described above fall within the same band –

---

[2] If simply calculating the four named in the indictment, that total loss amount is $1,879,478.72.

the $1,500,000 to $3,500,000 band from the 2B1.1 loss table – supports a conclusion that the Defendant's loss amount should be enhanced by 16 levels.

## CONCLUSION

In this case, the methodology proposed by the United States for determining loss is the best possible estimate based on the available evidence, and is consistent with the Guidelines and relevant case law. The PSR's loss calculation should be adopted by the Court.

Respectfully submitted,

ROBERT M. DUNCAN, JR.
UNITED STATES ATTORNEY

By:   /s/ Kathryn M. Anderson
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4885
FAX (859) 233-2747

## CERTIFICATE OF SERVICE

On October 29, 2020, I electronically filed this document through the ECF system, which will send notice to defense counsel of record.

/s/ Kathryn M. Anderson
Assistant United States Attorney